DECISION
{¶ 1} In this original action, relator, Charles I. Worrell, Jr., requests a writ of mandamus ordering respondent, Ohio Police and Fire Pension Fund ("OPFPF"), to vacate its decision denying him disability retirement and requests that OPFPF be ordered to find that he is entitled to a disability retirement. In the alternative, relator requests that OPFPF be ordered to issue a new decision which complies with the requirements of State exrel. Kidd v. Bd. of Trustees of Police Firemen's Disability Pension Fund (1991), 66 Ohio App.3d 647.
 {¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate concluded that the board failed to identify that evidence upon which it relied and failed to provide a reasonable explanation for its decision to deny relator's disability retirement. The magistrate recommended that this court issue a limited writ of mandamus sending this matter back to the board for further consideration and ordering the board to issue a decision, either granting or denying relator's disability retirement, identifying the evidence upon which the board relied and providing a reasonable explanation for its decision.
 {¶ 3} Both relator and respondent have filed objections to the magistrate's decision. Relator raises the following objection:
The Magistrate Erred In Failing To Address Worrell's Argument That OPFPF's Disregard Of R.C. 742.38(D)(3) Constituted A Clear Abuse Of Discretion And, Accordingly, That A Full Writ Of Mandamus Was Appropriate.
 {¶ 4} The presumption contained in R.C. 742.38(D)(3) is only applicable if no pre-existing conditions are present. Here, there is evidence of a pre-existing condition as noted in Finding of Fact No. 5 of the magistrate's decision; therefore, it was not necessary for the magistrate to discuss the presumption. Accordingly, we overrule relator's objection to the magistrate's decision.
 {¶ 5} Through its objection, respondent asserts that, since the magistrate made all the factual findings necessary to uphold the determination of the board, a remand is redundant and unnecessary because the board has already carried out its obligation to set forth in its decision the basis for its action and the evidence upon which it relied. Additionally, respondent contends that the magistrate misapplied this court's holding inState ex rel. Kidd, supra. For the reasons set forth in the magistrate's decision, we do not find respondent's position well-taken. The board's explanation refers to the evidence submitted by the BWC and Mifflin Township. However, when reviewing the record in this case, we note that there are numerous items submitted from each of these organizations, such that we are unable to determine what evidence the board relied upon in reaching its decision. Accordingly, we overrule respondent's objection to the magistrate's decision.
 {¶ 6} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we issue a limited writ of mandamus sending the matter back to the board for further consideration, and ordering the board to enter a new decision, either granting or denying relator's disability retirement, identifying the evidence upon which the board relied and providing a reasonable explanation for its decision.
Objections overruled; limited writ granted; action remanded.
Bryant and Petree, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. ) Charles I. Worrell, Jr., ) Relator, ) v. ) No. 05AP-490 Ohio Police Fire Pension Fund ) (REGULAR CALENDAR) and Board of Trustees Ohio Police ) Fire Pension Fund, ) Respondents. )
 MAGISTRATE'S DECISION Rendered on November 25, 2004 Charles Zamora, LLC, and Charles Zamora, for relator.
Jim Petro, Attorney General, and John T. Williams, for respondents.
 IN MANDAMUS {¶ 7} Relator, Charles I. Worrell, Jr., has filed this original action requesting that this court issue a writ of mandamus ordering respondent Ohio Police and Fire Pension Fund ("OPFPF") to vacate its decision denying him disability retirement and requests that OPFPF be ordered to find that he is entitled to a disability retirement. In the alternative, relator requests that OPFPF be ordered to issue a new decision which complies with the requirements of State ex rel. Kidd v. Bd. ofTrustees of Police Firemen's Disability Pension Fund (1991),66 Ohio App.3d 647.
Findings of Fact:
 {¶ 8} 1. Relator applied for employment with the Mifflin Township Fire Department ("Mifflin Township") on August 31, 2001. Relator was hired on as a full-time firefighter/paramedic on September 25, 2001. At the time, relator was 37 years of age (date of birth December 1, 1963), and had prior work experience as a paramedic.
 {¶ 9} 2. Thereafter, relator underwent a battery of diagnostic pre-employment medical testing required for perspective members of the OPFPF. See R.C. 742.38 and Ohio Adm. Code 742-1-02. Specifically, relator underwent the following tests: (1) cardiac stress test; (2) audiogram; (3) pulmonary function test; (4) chest x-rays; (5) various blood tests; (6) urinalysis; and (7) vision test.
 {¶ 10} 3. Dr. Robert Zee signed off on the results of the cardiac stress test which noted, in relevant part, as follows:
Resting ECG shows sinus tachycardia, left anterior hemi-block, and possible left atrial enlargement.
Patient reportedly took Claritin D for a sinus infection today and also drank coffee this morning.
Resting Heart Rate was Sinus tachycardia at 115 and Resting BP 166/88.
IMPRESSION:
* * *
[Four] Systolic hypertension (Resting BP 166/88 and maximum BP 208/80) but this may have been aggravated by his Antihistamine/Decongestant and Caffeine.
[Five] Resting sinus tachycardia but otherwise normal heartrate response with exercise.
 TEST CONCLUSION The resting heart rate may have [been] affected by his Claritin.D, Caffeine, and anxiety.
[Six] No significant arrhythmia.
No obvious ischemic response to exercise but the patient did have resting systolic hypertension which was aggravated by exercise and may have been affected by his recent Antihistamine/Decongestant and Caffeine as well as stress. I have advised the patient to avoid all Cardiac stimulants and Vaso-constrictor medications. He should then have his blood pressure re-evaluated. Might consider Echocardiogram to evaluate chamber size, wall thickness, wall motion study, and any valvular lesions.
(Emphasis sic.)
 {¶ 11} 4. The following was noted relative to the pulmonary test: "Patient gave good effort. * * * Patient had difficulty performing flow-volume loops properly. Patient states he has had a cold for a couple days." (Emphasis omitted.)
 {¶ 12} 5. The radiology report from his chest x-ray notes that relator is an "ex-smoker," and further provides that: "Exam of the chest demonstrates suggests [sic] evidence of chronic lung disease with slight accentuation of the lung markings."
 {¶ 13} 6. On October 2, 2001, Dr. Francisco J. Silva provided a preliminary opinion that relator was capable of performing the duties of a firefighter pending review of laboratory and other test results. After reviewing the results of the tests, Dr. Silva concluded that relator was medically cleared to perform his job duties as of October 8, 2001.
 {¶ 14} 7. Relator's first official on-station work day was October 9, 2001. Relator called in sick two days later, complaining of a draining, aching ear. Relator did not return to work until October 22, 2001.
 {¶ 15} 8. In October, relator was present at fire scenes to which Mifflin Township responded. On October 22, 2001, relator responded to a pick-up truck fire; on October 26, 2001, relator responded to a semi-tractor trailer fire; and on October 31, 2001, relator responded to a yard fire.
 {¶ 16} 9. The only departmental injury report in the record is for a shoulder injury suffered by relator on or about November 1, 2001. On his first report of injury ("FROI") form, relator indicated that, during a fire training exercise, he was chopping wood with an axe and dragging a log when he developed pain in his left shoulder. Relator indicated that he had difficulty moving, numbness in his left arm as well as stiffness and difficulty turning his neck. The record contains numerous medical reports/office notes relative to relator's left shoulder and neck over the course of the next several years. Furthermore, many of those reports refer to another work-related accident which occurred in 1996 and which has required a long-term course of pain management.
 {¶ 17} 10. Relator's workers' compensation claim was allowed for the right shoulder condition as follows: "sprain shoulder/arm nos left shoulder."
 {¶ 18} 11. On September 30, 2002, relator filed an application for disability retirement. On that form, relator was required to list his disabling conditions in order of severity and to provide the date of onset or injury. Relator listed his disabling conditions, in order of severity, as follows:
 [L]eft shoulder [injury]-sprain date of onset: 11-2-01 Neck Sprain date of onset 1-1-96 Concussion date of onset 1-1-96 [C]ontusion face, scalp, neck date of onset 1-1-96
 {¶ 19} 12. The earliest report of relator's alleged work exposures to smoke are alluded to in the April 24, 2003 office notes of Dr. Atul Goswami. Thereafter, relator submitted an FROI form to the Ohio Bureau of Workers' Compensation ("bureau") signed by Dr. Goswami relating to pneumonoconiosis.
 {¶ 20} 13. Dr. Goswami filled out an attending physician's report relative to relator's application for disability retirement. Dr. Goswami listed the following diagnoses: "HTN [hypertension][;] umbilicial hernia[;] depression[;] OA (L) shoulder[;] hyperlipidemia [sic]." Relator's medical records to not contain any references to smoke inhalation until the April 24, 2003 office notes of Dr. Goswami. Thereafter, relator underwent a pulmonary function test on October 22, 2003. As a result of those tests, Mr. David Lynn Jones, who was helping relator with his application, requested that "shortness of breath" be included on relator's disability application.
 {¶ 21} 14. In a report dated November 17, 2003, Dr. W. Kent Soderstrum noted the following:
Pulmonary Disease: Mr. Worrell reports that shortly after joining the Mifflin Township Fire Department, he was instructed to fight two fires without the use of his respiratory protective gear. One fire was a semi-truck carrying cars and the other fire was a house fire. He reports that he inhaled a significant amount of smoke and had increased coughing with production of black mucous for two weeks afterwards and some wheezing. He reports that he continues to have a lot of wheezing and a lot more cough than before. He reports that he gets short of breath with exertion, such as climbing a flight of stairs.
On October 22, 2003 Mr. Worrell underwent pulmonary function testing that revealed a pre-bronchial dialator FVC of 3.52 (66% of predicted) and a post-bronchial dilator FVC of 3.12 (-11.5% change); a pre-bronchial dialator FEV1 of 2.96 (68.4% of predicted) and a post-bronchial dilator FEV1 of 2.74 (-7.3% change); an FEV1/FVC ration of 84.0%, and a DLCO of 30.40 (77.1% of predicted). Mr. Worrell reports that he takes Advair inhaler 2 puffs BID and Albuterol inhaler 2 puffs as needed for his breathing problems. Last week he was prescribed a course of Medrol DosePak and Z-pack.
 {¶ 22} 15. Dr. Soderstrum opined that relator had a 15 percent whole person impairment due to his pulmonary disorder. Dr. Soderstrum also opined that relator was unable to safely perform activities requiring moderate or heavy workload conditions and, when considering all of his physical problems as well as his pulmonary problems, Dr. Soderstrum opined that these conditions were permanent and that relator could not safely perform his job.
 {¶ 23} 16. Dr. Soderstrum later prepared an addendum dated November 5, 2004, opining that relator's whole person impairment due to his pulmonary disorder was 26 percent.
 {¶ 24} 17. The record also contains the August 19, 2004 office notes of Dr. Ralph White, who noted as follows:
* * * He states that he had been jogging one-and-a-half miles about three to four days a week prior to September 2001 when he was working for the Mifflin Fire Department. In September 2001, he was told to fight a truck fire without his oxygen mask. A trailer carrying junked autos caught on fire and a lot of fumes emanated from that fire and his bronchial tubes got burned, and he began to have bad coughing attacks, wheezing, and shortness of breath. Since then, he has had daily shortness of breath in climbing up a flight of stairs sometimes accompanied by wheezing and chest tightness. Later in the week, he fought a house fire, again without his oxygen mask and inhaled additional thick smoke. He continued to have coughing, wheezing, chest tightness, and shortness of breath, which varied from day to day with the weather and with respiratory infections. So, his symptoms have got worse in the humid weather and worse if he had respiratory infections such as bronchitis or sinusitis. A Cardiolite stress test was negative for coronary artery disease. He had been a fireman since 1987 approximately 17 years, working for the Franklin Township Fire Department for 11 years, then the Copley Fire Department for about six years, and then the Mifflin Fire Department for about two months when the accidents happened. Prior to these episodes of smoke and fume inhalation, he had not been exposed to toxic fumes without wearing a respirator, which delivered air. * * *
* * *
The pulmonary function study revealed a restricted ventilatory defect of a moderate severity with mild to moderate decrease in flow through the small airways. He did not improve following albuterol on the study.
IMPRESSION: Variable dyspnea, wheezing, and chest tightness with weather changes and respiratory infections since being exposed to toxic fumes on one occasion in fighting a truck fire. It would be consistent with RADS or reactive airways dysfunction syndrome. Normally with RADS, one sees an obstructive ventilatory defect on pulmonary function testing, but I think that he probably had a erosive bronchitis or bronchiolitis, and he has some obliterative bronchiolitis, which is causing the restrictive ventilatory defect. Certainly, if he still has the abnormal pulmonary functions since the exposure to the truck fire, he should not engage in occupation where he is exposed to chemical fumes, significant dust, or humidity and temperature changes as it may worsen his asthma.
PLAN: Although, by history, he certainly appears to have reactive airways dysfunction syndrome, this has never been proven. I would like to have him undergo a histamine challenge study to see if indeed he has reactive airways dysfunction syndrome. I do feel that he is disabled from working as a fireman and working with chemical fumes, significant dust, temperature changes, etc. My recommendations would be going from Advair 250/50 mg to 500/50 mg, which has the higher dose of Flovent, which hopefully would reduce bronchial inflammation and edema. I would like to add Intal two inhalations four times daily to see if we can improve his exercise capacity. Even if we do improve his exercise capacity, he would still be disabled from any work that exposes him to chemical fumes as noted above.
 {¶ 25} 18. The record also contains the March 11, 2005 report of Dr. Thomas G. Olbrych who noted as follows in his report:
The Claimant is a 41-year-old white male who has described shortness of breath on stairs and upon carrying things, a non-productive cough and episodic wheezing. He at first noticed such symptoms in late October or early November of 2001. His primary care physician treated these with metered dose inhaler therapy and sent him to a pulmonary consultant for further evaluation and treatment. * * *
In reference to occupational history, the Claimant was trained as a Bath/Copley firefighter paramedic since 1997. He has worked in that department part time since September of 2001. He was always trained to use a self-contained breathing apparatus (SCBA) when fighting a fire. In September of 2001 he tested for joining the Mifflin Fire Department as a full-time firefighter. He passed his pre-employment physical normally. While employed by Mifflin, he describes responding to three fires: One involving a semi-tractor trailer, the second a yard/home fire, and the third a vehicle fire. These first exposures occurred within the first week. He informs me that he was advised by his chief not to bother to wear the SCBA pack as he approached a burning vehicle. Shortly thereafter he developed coughing, sneezing and soot-colored mucous from the nose and chest. These symptoms persisted for a month later, at which time he sought medical assistance. When he responded to the semi-tractor trailer fire, again he was ordered not to wear the SCBA. He noticed coughing, wheezing and sneezing with soot-colored mucous from the nose and chest for approximately one week. He was also advised to fight the house/yard fire without the SCBA. He has had episodic symptoms as described above since then.
* * *
[One] The medical evidence attached supports the diagnosis of reactive airways dysfunction syndrome (RADS), as a direct and proximate result of the exposures alleged.
[Two] The medical evidence and examination of the worker support the causal relationship between the exposures as described and the development of reactive airways dysfunction syndrome. Strongly supporting this is the normal spirometry prior to these exposures.
[Three] Reactive airways dysfunction syndrome did not pre-date the Claimant's exposures.
[Four Five] I discussed with the worker all the factors related to the injury. It is my impression that the patient had no underlying preexisting pulmonary disease. This is supported by a normal pre-employment physical and his normal spirometry. Reactive airways dysfunction syndrome has been described to occur following variable exposures to toxic inhalants, followed by symptoms of bronchial hyper-responsiveness such as cough, wheeze and shortness of breath, and physiologic evidence of airway hyper-responsiveness as has been documented by his histamine inhalation challenge.
 {¶ 26} 19. On February 1, 2004, Dr. Joel Steinberg reviewed the medical records and concluded, with a high degree of probability, that relator was permanently incapacitated from the performance of his duties as a firefighter, further indicates that the nature of the disability is on-duty and that the noted disability is respiratory disease. However, in Dr. Steinberg's notes, he specifically indicates that the "[left] shoulder is only duty related injury."
 {¶ 27} 20. Dr. W. Bruce Walsh also examined the records and concluded that relator could perform sedentary light and medium exertional work activity and that his combined physical, mental and vocational limitations suggest an earning capacity loss that is mild. Dr. Walsh indicated that further discussion by the panel was warranted.
 {¶ 28} 21. On March 29, 2004, Dr. Steinberg indicated that relator was not incapacitated from the performance of his job due to his left shoulder injury. In his notes, Dr. Steinberg indicated that, although relator's level of disability is moderate-severe to severe, it does not appear to be duty related.
 {¶ 29} 22. As the medical advisor for OPFPF, Dr. Manual Tzagournis opined that relator was permanently incapacitated from on-duty injuries.
 {¶ 30} 23. The OPFPF issued its decision at its March 29, 2005 meeting and denied relator's application as follows:
* * * In his Medical Recommendation for Appeal Hearings dated March 18, 2005, OPF Medical Advisor Manuel Tzagournis concluded that Mr. Worrell was permanently incapacitated primarily due to lung disease and this disability was "enhanced" by a shoulder condition. While certifying Mr. Worrell's alleged disability as on-duty, however, Dr. Tzagournis explained that "[i]t appears that the shoulder injury occurred while he was in training in 2001. Accordingly, that aspect of his disorder is on-duty." He also referenced that his recommendation was based on medical information since factual information was unclear. Dr. Tzagournis did not make reference to the respiratory condition as being incurred on-duty, and in his additional remarks, he questioned when this condition would have been incurred.
One of the reports that Dr. Tzagournis gave particular relevance to was the supplemental report issued by Dr. Joseph Jasser dated March 4, 2005, which found that Mr. Worrell's left shoulder condition resulted in him being temporarily
incapacitated. Ohio Revised Code Section 742.38(D)(1)(b) requires that a member be permanently disabled in order to be eligible for disability benefits. Accordingly, while the left shoulder condition was incurred on-duty, it is not permanently disabling and, therefore, an on-duty disability must be denied for this condition.
With respect to the alleged respiratory condition, Mr. Worrell provided OPF with additional documentation showing that the BWC had allowed his claim for this condition. According to the impairment and disability evaluation criteria outlined in Administrative Rule 742-3-05, the DEP and Board must consider and base its findings on all competent evidence made available to it. Paragraph (B)(4) of this Rule provides that "[t]he consideration of a member's application shall be limited to the disabling condition(s) listed in the application or disclosed by the examination of the physician(s) selected by OPF. The DEP and the board shall consider and base its findings and recommendations on all competent evidence made available to it, including medical testimony, opinions, statements, and medical reports submitted by the member's employer under section 742.38 of the Revised Code and rule 742-1-02 of the Administrative Code."
A review of the BWC documentation submitted by Mr. Worrell, however, indicates that his alleged respiratory condition was incurred subsequent to his membership in OPF since the date of injury is noted as January 4, 2004. Since Mr. Worrell's OPF membership ended on November 16, 2001, his alleged respiratory condition would have been incurred after his time as a member of OPF. Documentation provided by Mifflin Township also does not support Mr. Worrell's injury date as falling within the period of membership covered by OPF. In light of the foregoing, and the fact that Mr. Worrell is not eligible to receive an off-duty grant since his years of service are less than five years, as required by Ohio Revised Code Section 742.38(D)(4), Mr. Worrell's application for disability for this condition must be denied.
(Emphasis sic.)
 {¶ 31} 24. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law:
 {¶ 32} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law.State ex rel. Berger v. McMonagle (1983), 6 Ohio St.3d 28.
 {¶ 33} A writ of mandamus will issue only where the board has violated a clear legal duty. State ex rel. Marshall v. Keller,Admr. (1968), 15 Ohio St.2d 203. In addition, it is well-established that a reviewing court may not substitute its judgment for that of an administrative board. State ex rel.Brunson v. Bedner (1971), 28 Ohio App.2d 63.
 {¶ 34} Relator asserts that the board abused its discretion by denying his application for disability retirement where all the medical evidence in the record indicated that relator was permanently disabled due to his respiratory conditions. On the other hand, respondent contends that the evidence in the record was subject to two conclusions and that there were numerous reasons why the board concluded that relator's respiratory problems were not incurred on-duty and therefore relator was not entitled to disability retirement.
 {¶ 35} In Kidd, supra, this court found that the requirements applied to decisions from the Industrial Commission of Ohio ("commission") applied equally to decisions from the OPFPF. As such, the board is required to issue decisions which specifically set forth the basis therefore in order to enable courts to readily discern the specific grounds relied upon and determine whether the record supports such a finding when a party to the proceedings initiates an action for a writ of mandamus. See State ex rel. Mitchell v. Robbins Myers, Inc. (1983),6 Ohio St.3d 481, and State ex rel. Noll v. Indus. Comm. (1991),57 Ohio St.3d 203. As this court noted, the issues upon which the board and the commission determine the right of individuals to receive benefits and the extent to which the benefits will be given are similar and the standard of review of their decisions upon review in mandamus are both an abuse of discretion standard. As such, meaningful review of the board's decisions can be accomplished only where the board prepares orders which specifically state the evidence which has been relied upon and contain the reasoning explaining its decision.
 {¶ 36} In the present case, the board cited the following reasons for denying relator's application: (1) in his medical records review, Dr. Tzagournis questioned when relator's respiratory condition would have been incurred; and (2) the documentation from the bureau indicates that the date of injury was January 4, 2004. Because relator's membership ended November 16, 2001, the board concluded that his respiratory condition was not incurred on-duty.
 {¶ 37} The magistrate finds the board's above explanation to be deficient under the requirements of Noll and Kidd. It is generally understood that respiratory conditions, unlike direct physical injuries, progress over time. As such, the magistrate finds that the board's reliance upon the January 4, 2004 date utilized by the bureau constituted an abuse of discretion. Any exposure relator may have had clearly would have pre-dated January 4, 2004 and this was never in dispute. However, because the magistrate finds that there are a lot of unanswered questions in this case, the magistrate recommends that the board be ordered to issue a new order, granting or denying the application, after citing the evidence relied upon and providing a brief explanation. The magistrate does note that respondent is correct, the record does reflect numerous reasons why the application could have been denied; however, the board did not cite any of those reasons. The board could have found that relator's statements to medical personnel three years after his termination were self-serving and lacked credibility because there was no contemporaneous medical evidence indicating that relator sought any treatment for a persistent cough nor did he mention the dark colored mucous which he allegedly was coughing up for approximately one month after he worked on the fires. However, as stated previously, the board only relied on a statement made by Dr. Tzagournis questioning the date of onset of relator's respiratory conditions while opining that he is permanently incapacitated from performing his job duties and the January 4, 2004 date used by the bureau. The board's decision is not supported by the board's citation to evidence and the decision lacks any explanation. As such, the magistrate finds that the decision violates the requirements of Kidd and constitutes an abuse of discretion.
 {¶ 38} Because this magistrate finds that the board has failed to identify that evidence upon which it relied and failed to provide a reasonable explanation for its decision to deny relator's disability retirement, the magistrate would issue a limited writ of mandamus sending this matter back to the board for further consideration and ordering the board to issue a decision, either granting or denying relator's disability retirement, identifying the evidence upon which the board relied and providing a reasonable explanation for its decision.